1 | PAUL S. MARKS, State Bar No. 138407
      pmarks@neufeldmarks.com
2 | **NEUFELD MARKS**
      **A Professional Corporation**
3 | 250 E. 1st Street, Suite 1101
      Los Angeles, California 90012
4 | Telephone:  (213) 625-2625
      Facsimile:  (213) 625-2650
5 |
      Attorneys for defendants Claiborne Tanner
6 | and Tanner Law Firm, LLC

7 |

8 | **UNITED STATES DISTRICT COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10 |

11 | PURPLE MOUNTAIN HOLDINGS,     Case No.
      INC.; CENTRAL PARTNERS
12 | PARENT GROUP, INC.; CMX        **NOTICE OF REMOVAL**
      DISTRIBUTION, INC.; ECS         **OF ACTION**
13 | LABORATORIES, INC.; BRAND
      PACK, LLC; THE FOUR, LLC,      **UNDER 28 U.S.C. § 1441(b)**
14 |                                                **(DIVERSITY OF CITIZENSHIP)**
                    Plaintiffs,
15 |
             vs.
16 |
      CLAIBORNE TANNER and TANNER
17 | LAW FIRM, LLC, and DOES 1
      through 100,
18 |
                    Defendants.
19 |

20 |

21 |

22 |       TO THE CLERK OF THE ABOVE-ENTITLED COURT:

23 |       PLEASE TAKE NOTICE that defendants CLAIBORNE TANNER and

24 | TANNER LAW FIRM, LLC hereby remove to this Court the California state court

25 | action described below.

26 |       1.       On June 28, 2021, an action was commenced in the Superior Court of

27 | the State of California, County of Orange, entitled *Purple Mountain Holdings, Inc.*

28 | *etc. v. Claiborne Tanner et al.,* Case No. 30-2021-01207562-CU-PN-CJC.

NEUFELD MARKS
A PROFESSIONAL CORPORATION
250 E. 1st Street • Suite 1101 • Los Angeles, California 90012
Telephone: (213) 625-2625 • Facsimile: (213) 625-2650

2.    A true and correct copy of the above-described Complaint is attached hereto as Exhibit A.

3.    A true and correct copy of the Summons that defendants received is attached hereto as Exhibit B.

4.    No appearance has been made by any defendant in the state court action.

5.    This case is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1332, and is one which may be removed to this Court by defendant pursuant to 28 U.S.C. § 1441(b) in that it is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of costs, as referenced in the attached Complaint. (*See* Exhibit A (Complaint), at ¶ 93, p. 17, line 12.)

6.    Complete diversity of citizenship exists in that each plaintiff is a citizen of the State of California, and each defendant is a citizen of the State of Louisiana.

7.    Notice of the state court complaint was received by defendants no earlier than July 5, 2021. In any event, the Complaint does not reveal the citizenship of each party to the Complaint. Therefore, the 30-day deadline for removal does not apply here. (*Harris v. Bankers Life & Cas. Co.*, 425 F.3d 689, 694 (9th Cir. 2005).)

DATED: July 28, 2021

NEUFELD MARKS
   A Professional Corporation
Paul S. Marks

By:    /s/ Paul S. Marks
       Paul S. Marks
       Attorneys for defendants Claiborne Tanner
       and Tanner Law Firm, LLC

NEUFELD MARKS
A PROFESSIONAL CORPORATION
250 E. 1st Street • Suite 1101 • Los Angeles, California 90012
Telephone: (213) 625-2625 • Facsimile: (213) 625-2650

2
NOTICE OF REMOVAL OF ACTION

Exhibit A

Electronically Filed by Superior Court of California, County of Orange, 06/25/2021 05:52:58 PM.
30-2021-01207562-CU-PN-CJC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By Katie Trent, Deputy Clerk.

1   JACQUELINE S. VINACCIA SBN: 149885
   **VANST LAW, LLP**
2   3170 Fourth Ave., Suite 250B
   San Diego, CA 92101
3   TEL: 858 243 4299
   JSV@Vanstlawfirm.com
4

5   Attorneys for Plaintiffs, PURPLE MOUNTAIN HOLDINGS, INC.; CENTRAL PARTNERS
   PARENT GROUP, INC.; CMX DISTRIBUTION, INC.; ECS LABORATORIES, INC.; BRAND
6   PACK, LLC.; THE FOUR, LLC

7

8                   **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                            **COUNTY OF ORANGE**

10   PURPLE MOUNTAIN HOLDINGS, INC.;      Case No.:   30-2021-01207562-CU-PN-CJC
    CENTRAL PARTNERS PARENT GROUP,
11   INC.; CMX DISTRIBUTION, INC.; ECS      [UNLIMITED CIVIL]
    LABORATORIES, INC.; BRAND PACK,
12   LLC.; THE FOUR, LLC.                   **COMPLAINT:**
                                            1.  **PROFESSIONAL NEGLIGENCE**
13              Plaintiff,                  2.  **BREACH OF FIDUCIARY DUTIES**
                                            3.  **VIOLATION OF BUSINESS &**
14   v.                                         **PROFESSIONS CODE § 6125 –**
                                                **DISGORGEMENT OF FEES PAID**
15   CLAIBORNE TANNER AND TANNER LAW
    FIRM, LLC, and DOES 1 through 100,      **Assigned for All Purposes**
16
                Defendants.                 Judge Martha K. Gooding
17

18

19

20

21        Plaintiffs, PURPLE MOUNTAIN HOLDINGS, INC.; CENTRAL PARTNERS PARENT

22   GROUP, INC.; CMX DISTRIBUTION, INC.; ECS LABORATORIES, INC.; BRAND PACK,

23   LLC.; and THE FOUR, LLC, allege as follows:

24                   **PARTIES, JURISDICTION, AND VENUE**

25        1.      Plaintiff, PURPLE MOUNTAIN HOLDINGS, INC. (PMH), is and at all times

26   mentioned was a corporation formed and operating under the laws of the State of California with its

27   principal place of business in Costa Mesa California.

28

                                    - 1 -
                                   COMPLAINT

2.      Plaintiff, CENTRAL PARTNERS PARENT GROUP, INC. (CPPG), is and at all times mentioned was a corporation formed and operating under the laws of the State of California with its principal place of business in Costa Mesa California.

3.      Plaintiff, CMX DISTRIBUTION, INC. (CMX), is and at all times mentioned was a licensed cannabis distribution business, and a corporation formed and operating under the laws of the State of California with its principal place of business in Costa Mesa California.

4.      Plaintiff, ECS LABORATORIES, INC. (ECS), is and at all times mentioned was a corporation formed and operating under the laws of the State of California with its principal place of business in Costa Mesa California.

5.      Plaintiff, BRAND PACK, LLC. (Brand Pack), is and at all times mentioned was a limited liability corporation formed and operating under the laws of the State of California with its principal place of business in Costa Mesa California.

6.      Plaintiff, THE FOUR, LLC (The Four), is and at all times mentioned was a limited liability corporation formed and operating under the laws of the State of California with its principal place of business in Costa Mesa California.

7.      Defendant, CLAIBORNE TANNER (Clay Tanner), is an at all times mentioned was a resident of the State of Louisiana, and a licensed attorney in the State of Louisiana, and the managing member of TANNER LAW FIRM, LLC.  Plaintiffs are informed and believe that Defendant Clay Tanner has never held a license to practice law in the State of California.

8.      Defendant, TANNER LAW FIRM, LLC (Firm), is and at all times mentioned was a limited liability company formed and operating in the State of Louisana and is engaged in the practice of law. Defendant, Clay Tanner, is the managing member of TANNER LAW FIRM, LLC.

9.      Defendant, Clay Tanner, is also an owner of Hillboro Brown Capital, LLC (HBC), a California limited liability company with its principal place of business in Orange County California.

10.     Clay Tanner provided legal services and advice to Plaintiffs and HBC in Orange County California in relation to the Plaintiffs' business operations and investor funding in the context of California's legal cannabis laws and regulations.  On that basis, Plaintiffs allege that jurisdiction and venue for this action are proper in the Orange County Superior Court.

1  11.  Plaintiffs are informed and believe that Clay Tanner maintains an apartment for his

2 frequent trips to Orange County California and that he still maintains business operations in Orange

3 County California

4  12.  The true names and capacities of Defendants Does 1 through 100 inclusive are

5 unknown at this time to Plaintiffs, who therefore sues them under such fictitious names pursuant to

6 Code of Civil Procedure section 474. When the true names and capacities of the Doe Defendants are

7 ascertained by Plaintiffs, they will seek leave to amend this Complaint to allege the same.

8  13.  Plaintiffs are ignorant and unaware of the true names, capacities, interests, or basis for

9 liability by Defendants identified as Does 1 through 100, inclusive, and therefore sues these

10 Defendants by such fictitious names. Plaintiffs are informed and believe and thereon allege that at all

11 times relevant to this action, Does 1 through 100, and each of them, claim certain interests or were

12 acting as the agent, servant, principal, employee, partner, trustee, or joint venture of each of the other

13 Defendants in doing the things alleged herein and is responsible in some manner for the damages and

14 disputes alleged in this Complaint and/or the relief sought in this Complaint. Plaintiffs will amend

15 this Complaint to allege the true names and capacities of Does 1 through 10 when they are ascertained.

16           **GENERAL ALLEGATIONS**

17  14.  Clay Tanner was first introduced to the California cannabis industry through Ben

18 Knight, a long time friend, in approximately October 2017. Prior to October 2017, Clay Tanner had

19 no knowledge of or experience in the cannabis industry from either a legal perspective or a business

20 perspective.

21  15.  Mr. Knight introduced Clay Tanner to Robert Taft, Jr. and Jeff Holcombe, owners of

22 several cannabis business in Orange County California, including an operating medical cannabis

23 dispensary entitled 420 Central in Santa Ana, California.

24  16.  Clay Tanner agreed to join the cannabis opportunity presented by agreeing to raise

25 capital even though he had never raised capital of the scale that would be required to fully fund the

26 envisioned cannabis operations. Clay Tanner made the legal recommendation to Mr. Taft, Mr.

27 Knight, and Clint Tanner that he put together an investment fund to procure the money necessary to

28

1  fund the cannabis opportunities envisioned, though he had little to no experience creating such an
2  investment fund.

3       17.    Shortly after their initial meeting, Clay Tanner drafted the "Summary of Terms for
4  Capital Infusion and Partnership between Ben Knight and Robert Taft, Jr." (Summary Agreement).
5  (A true and correct copy is attached hereto as Exhibit 1 and incorporated by reference.)  It is unclear
6  who Clay Tanner's client was in this transaction, or if either party had separate counsel or were
7  informed of the potential conflict.

8       18.    The Summary Agreement was drafted to document the relationship between Ben
9  Knight and Robert Taft, Jr. with respect to the proposed investment of capital and future services to
10 certain businesses. The Summary Agreement was executed and entirely performed within the State
11 of California.  The investment and services contemplated included:

12       a.   an initial contribution into Purple Mountain Holdings, Inc. (PMH), a California
13            Corporation;

14       b.   services of Ben Knight as a chief financial officer to raise capital, and overseeing legal,
15            tax, and organizational structure, and implementation of software; and

16       c.   raising capital for PMH.

17       19.    Clay Tanner also drafted a "Joint Venture Agreement" (JV Agreement) that was
18 executed by Robert Taft, Jr. Jeff Holcombe, Jorge Burtin, individually, and as trustee of The Jorge
19 Burtin Family Trust and The Rosalba Burtin Family Trust (Burtin), and Ben Knight, as Manager of
20 Hillsboro Brown Capital, LLC (HBC). (A true and correct copy of the JV Agreement is attached
21 hereto as Exhibit 2 and incorporated by reference.) It is unclear who Clay Tanner's client was in this
22 transaction, or if any of the parties had separate counsel or were informed of the potential conflict.

23       20.    Plaintiffs are informed and believe that Clay Tanner was an owner of at least 47.5%
24 of HBC at the time the JV Agreement was drafted and executed.

25       21.    Clay Tanner prepared the "Limited Liability Operating Agreement for Hillsboro
26 Brown Capital, LLC" (HBC Operating Agreement), and acted as its counsel in preparing that
27 agreement.  (A true and correct copy of the HBC Operating Agreement is attached hereto as Exhibit
28 3 and incorporated by reference.)

**PMH INVESTMENT FUND**

22.    In or about November 2017, Clay Tanner formed PMH Investment Fund, LLC, (the Fund) a Louisiana limited liability company for the purpose of raising money for investment into Central Partners Parent Group, Inc., a California corporation (CPPG), and PMH.  Plaintiffs are informed and believe and thereon alleged the Clay Tanner had little to no experience forming investment funds or preparing offering memoranda for such funds prior to his formation of the Fund.

23.    In or about November 2017, Clay Tanner also assisted in the formation of PMH Investment Manager, LLC, a Louisiana limited liability company (the Fund Manager) for the purpose of managing the operations of the Fund.  The Manager of the Fund Manager was Clint Tanner, Clay Tanner's brother.

24.    In or about November 2017, Clay Tanner prepared the Confidential Private Offering Memorandum for PMH Investment Fund, LLC (First Offering Memo) for use in soliciting funds from potential investors for investment into CPPG and PMH.  The First Offering identifies Clay Tanner as General Counsel for CPPG and PMH.  (The First Offering Memo is designated Confidential in a related lawsuit pending before this court.  Thus, it is not appended to this complaint.  It can be submitted to the court under seal as required during this action.)

25.    Clay Tanner, with some assistance of general contractor Robert LaFreeda, prepared a construction budget as part the First Offering Memo though his construction experience is limited to his legal work performed outside of California and despite his complete lack of knowledge of any unique building regulations related to the cannabis industry in California.  Instead, Clay Tanner asserts that there is no real difference between the construction of a cannabis manufacturing facility and the construction of any other type of manufacturing facility, other than the type of equipment installed in the facility.

26.    The Fund was created to gather investors to purchase 7.5% of the issued and outstanding shares in CPPG and 10% issued and outstanding shares of PMH.  Clay Tanner represented the investment into PMK was to provide funds for the tenant improvements to complete a cannabis manufacturing and distribution facility known as Toronto Way Partners, Inc. dba The Healing Plant (THP).  Clay Tanner stated that THP was anticipated to operate as a "fully permitted

1  marijuana manufacturing facility which [would] provide pharmaceutical grade cannabis-extract raw

2  products and cannabis-infused final products to the cannabis industry."

3       27.     At the time the First Offering Memo was prepared and presented to potential investors,

4  HBC was an owner of a substantial percentage of the stock in CPPG and PMH, and Clay Tanner was

5  an owner of at least 47.5% of HBC.

6       28.     The First Offering Memo also identifies the Firm's IOLTA Trust Account as the

7  Escrow account for the investor money, and Claiborne Tanner as the contact for that escrow account.

8       29.     After the Fund money was placed into the Firm's IOLTA Trust Account, Clay Tanner

9  became the only person with access to those funds, and the only person to distribute those funds.

10                              **REORGANIZATION OF CPPG**

11       30.     In or about December 2017, Clay Tanner also prepared the Corporate Reorganizing

12  Plan for Central Partners Group, the Action by Unanimous Written Consent of the Board of Directors

13  of Central Partners Group, Inc., a California Corporation, the Stock Subscription Agreement for

14  Central partners, Inc., the Articles of Incorporation of CPPG, the Minutes of the First Organizations

15  Meeting of Incorporators and Initial Directors of Central Partners Parent Group, Inc., a Waiver of

16  Notice and Consent to Holding of First Meeting of Incorporators and Directors of Central Partners

17  Parent Group, Inc., the Agreement and Plan of Merger/Share Exchange for Central Partners Parent

18  Group, Inc. and Central Parents Group, Inc., and the Notice of Approval of Merger and  Certain

19  Shareholder Rights, for the merger of the two corporations.  Clay Tanner has stated in sworn

20  testimony that for the preparation of these documents his client was CPPG, despite his not being

21  licensed/authorized to practice law in California.

22                              **THP CONSTRUCTION**

23       31.     In or about March 2018, Clay Tanner decided that the construction of the tenant

24  improvements for THP was not progressing as quickly as he believed it should and appointed himself

25  project manager to over see the completion of the construction.  Clay Tanner paid the Firm a monthly

26  "salary" out of the Fund money in the Firm's IOLTA Trust account for his legal work and services

27  as project manager at THP even though he had little construction or project management experience,

28  and no prior experience in the cannabis industry.

32.     At no time during his tenure as General Counsel for PMH or any related entity did Clay Tanner ensure that there was any contract between the entities and Robert LaFreeda's construction company, RL Construction, who Clay Tanner and Ben Knight had hired to build out of the tenant improvements at THP. Instead, he simply dispersed the Fund's money to Robert LaFreeda from the Firm's IOLTA Trust account at the request of Mr. LaFreeda.

33.     At no time during his tenure as General Counsel for PMH did Clay Tanner document his assumed role as project manager with PMH or any of the other Plaintiffs.

34.     In or about April 2018, it was discovered that additional investment would be necessary to complete the build out of the PMH facility. Clay Tanner drafted a 2nd Round Funding Confidential Private Offering Memorandum (Second Offering Memo) largely based on the terms of the First Offering Memo. The Second Offering Memo sought to raise an additional $1.5 million for the purchase of an additional 10% of the shares in PMH.

35.     Thereafter, the Fund accepted money under the Second Offering Memo and all money invested by the Fund members under the Second Offering Memo were also escrowed through the Firm's IOLTA Trust account with Clay Tanner being the sole person able to access that money for distribution.

36.     Although Clay Tanner has stated in sworn testimony that he, Ben Knight, and Robert Taft were originally meant to receive a salary from PMH, the Firm's IOLTA Trust account summary confirms that only the Firm was paid a regular salary and Clay Tanner's cost reimbursements between January 2018 and April 2019. Clay Tanner has also testified in deposition that no one was required to verify or approve his cost reimbursements before they were paid to him.

37.     The Firm collected, at least, $161,694.50 in salary for legal services and cost reimbursements from PMH according to Clay Tanner's own Trust Account Summary produced in the related action.

## LEGAL WORK FOR RELATED ENTITIES

38.     Beginning in 2018, Clay Tanner represented to third parties that he was General Counsel for CMX and prepared several agreements and other documents on behalf of CMX.

- 7 -

COMPLAINT

1    39.    In January 2018, Clay Tanner prepared an investor term sheet for Robert LaFreeda's
2    sister, Dawn LaFreeda's, to solicit her investment of $750,000 into CMX. He forwarded that term
3    sheet to Ben Knight for review on the Firm's email. Thereafter, Dawn LaFreeda made a $750,000.00
4    investment from her company Gemini 8. Clay Tanner received that money into the Firm's IOLTA
5    Trust account and distributed that money in the same manner as the Fund money, meaning that Clay
6    Tanner had sole access to that money for distribution.

7    40.    Plaintiffs are informed and believe that one of the agreements prepared by Clay Tanner
8    as General Counsel for CMX was an Equipment Lease/Purchase Agreement whereby CMX agreed
9    to lease to own certain manufacturing and processing equipment from Verde X, Inc. While Clay
10    Tanner prepared and Ben Knight executed the agreement, neither ever informed the other owners or
11    the accountant for CMX and thus no payments were ever made on the equipment. The equipment
12    was repossessed by the lessor after months of discussions between new counsel for CMX and the
13    lessor's attorney.

14    41.    Plaintiffs are also informed and believe that Clay Tanner drafted an Equipment Lease
15    Financing Agreement between THP for the lease of extraction and manufacturing equipment for the
16    bottling line envision to be operated by The Habit, a company that was negotiating leased space at
17    THP. Under the terms of the agreement, Verde X, Inc. agreed to finance $800,000 for the acquisition
18    of the bottling line equipment. Unbeknownst to PMH, Verde X, Inc. only ever financed $200,000 of
19    the $800,000 and no payments were ever made on the $200,000 financed. Clay Tanner abandoned
20    his legal representation of Toronto Way Partners, Inc. without making any arrangements for payment.

21    42.    In March and September 2018, CMX paid legal fees to Clay Tanner for his legal work
22    totaling $10,000.00.

23    43.    In October 2018, Clay Tanner signed a Commercial Property Purchase and Sale
24    Agreement on behalf of CMX for the purchase of a neighboring commercial condominium unit to
25    allegedly be financed by a third party. CMX advanced more than $129,000 toward that property
26    purchase before it fell through. Clay Tanner walked out of CMX before recovering that $129,000
27    advance leaving CMX with no information on the contemplated purchase or how to recover the
28    advance.

- 8 -
COMPLAINT

1    44.    On or about February 21, 2019, Clay Tanner sent Robert Taft, Jeff Holcombe, Jorge

2   Burtin and Ben Knight an email from the Firm's email stating that he would be preparing corporate

3   documents for CPPG, CMX, and PMH that each would need to review, have their attorneys review,

4   and the sign.  Clay Tanner has stated in sworn testimony that he was acting as General Counsel for

5   each of these entities at the time he prepared these documents, even though each of these entities is

6   formed and operating in California and even though Clay Tanner is not licensed/authorized to practice

7   law in California.

8    45.    In October 2018, Clay Tanner prepared corporate documents for several entities

9   including:

10         a.  **For PMH** – a Unanimous Consent for the second round investment from the Fund

11            providing the Fund an additional 10% ownership in PMH for the $1.5 million in

12            additional investment;

13         b.  **For CPPG** – Bylaws that no longer identify Todd Teach's interest in CPPG;

14         c.  **For Cadillax Partners, LLC** – an Amended and Restated Operating Agreement that

15            reflects the buy of Kris Kanik, and a Statement of Information reflecting then current

16            ownership;

17         d.  **For Central Franchise Group, LLC** – an Operating Agreement to reflect the buyout

18            of Kris Kanik, though Clay Tanner admits not knowing what the operation of this

19            company were;

20         e.  **For Band Pack., LLC** – an Operating Agreement; and

21         f.  **For The Four, LLC** – an Operating agreement, though Clay Tanner admits not

22            knowing what the operations of this company were.

23    46.    All of these documents were sent to Robert Taft, Jeff Holcombe, and Ben Knight from

24   Clay Tanner's Firm email.  Clay Tanner has stated in sworn testimony that the preparation and

25   execution of these documents was important to establish proper ownership in each entity to include

26   HBC.

27    47.    In or about November and December 2018, Clay Tanner prepared an Assigned of

28   Purchase Agreement on behalf of ESC Laboratories. After preparing the agreement, and negotiating

1  with the escrow agent, Clay Tanner informed the parties to the agreement, in an email no longer on

2  the Firm's letterhead, disclosing for the first time that he had a personal financial interest in Cadillax

3  Partners, LLC, one of the parties to the transaction.  He never advised the parties that this amounted

4  to a conflict of interest, nor did he disclose that he had no authorization to practice law in California.

5      48.    In or about January 2019, Clay Tanner revised the operating agreement for HBC to

6  provide Robert LaFreeda with a 15% ownership interest in the company.

7      49. In March 2019, Clay Tanner began pressuring the parties to the entities' agreements for PMH,

8  CPPG, Central Franchise Group, Brand Pack, and The Four to sign and finalize the agreements.

9  Though each of the agreements is back dated to a date in 2018, all of the operating agreements were

10  signed in March 2019.

11     50. In or about May 2019, Clay Tanner abandoned his involvement with PMH, CPPG, CMX,

12  Cadillax Partners, and all related entities.  As a result of his abandonment of his clients without

13  warning or attempt to safeguard his clients' rights, Plaintiffs were required to retain counsel to

14  respond to several demands for payments on defaulted agreements and to make payments on

15  agreements for leases on equipment that was never used because the THP was left incomplete, and

16  no arrangements were made with CMX.

17     51. Clay Tanner never presented any of the entities or individuals he performed legal work for in

18  California with any engagement agreement, and/or disclosure of potential or actual conflict of

19  interest.  Nor did he ever inform any of these clients that he was not licensed or authorized to practice

20  law in California.  All these actions are in violation of California Business & Professions Code § 6125

21  and California Rules of Professional Conduct, Rule 1.7 (formerly Rule 3-310.)

22                    **FORMATION AND OPERATION OF COMPETING BUSINESSES**

23     52. In April 2019, Clay Tanner developed and participated in a plan to sell the uncompleted and

24  non-operating THP without the knowledge or consent of the remaining owners.  That sale attempt

25  was a clear breach of Clay Tanner's professional and fiduciary duties to PMH, and THP, at a

26  minimum.

27     53.    Plaintiffs are informed and believe that by March or April 2019, Clay Tanner was

28  using the confidential information and knowledge he gained while performing legal and other work

COMPLAINT

1  for Plaintiffs to form and operate his own competing cannabis businesses within a half mile of several

2  of his clients, and businesses in which he still had a personal financial interest.

3      54. In or about February 2020, Clay Tanner formed California Leaf Company (Cal Leaf), a

4  cannabis business that operates within one half mile of THP, CMX, and their related entities.  Cal

5  Leaf operates in direct competition to THP, and usurped THP's business opportunity with Ninja

6  Consultation Group, LLC, dba The Habit for a bottling operation for cannabis infused beverages.

7  Plaintiffs are informed and believe that Ben Knight is a partner with Clay Tanner in Cal Leaf.

8      55.      In June 2018, in his position as General Counsel for PMH, Clay Tanner prepared draft

9  agreements between PMH/THP and The Habit for the installation and operation of a bottling line for

10  cannabis infused beverages packaged under The Habit brand.  That agreement included a partial

11  ownership in The Habit by PMH/THP.  Clay Tanner never completed the transaction.  Instead, he

12  usurped the corporate/business opportunity for himself and his own company Cal Leaf.

13      56. Plaintiffs are informed and believe that by March 2019 Clay Tanner had usurped the

14  corporate/business opportunity with The Habit and had already obtained an ownership interest in that

15  entity.  Plaintiffs are also informed and believe that as of March 2019, Clay Tanner had already begun

16  construction on his competing cannabis business.

17      57. Plaintiffs contend that Clay Tanner used the confidential information he learned in his role as

18  General Counsel for Plaintiffs to form and operate this competing business within one half mile of

19  many of the Plaintiffs entities in violation of his duties of care, and fiduciary duties as General

20  Counsel for Plaintiffs.

21      58. In or about August 2019, Clay Tanner formed 3550 Cadillac Ave, LLC.  Plaintiffs are

22  informed and believe that this is another cannabis business that operates in direct competition to

23  Plaintiffs.

24                              **HBC LAWSUIT**

25      59.      In August 2019, HBC and the Fund filed a lawsuit against Mr. Taft, Mr. Holcombe,

26  and Jorge Burtin for breach of contract, fraud, breach of fiduciary duty, conspiracy to commit breach

27  of fiduciary duty, dissolution of partnership and corporations, turnover of corporate books and

28

1  records, and injunctive relief entitled *Hillsboro Brown Capital, LLC et al v. Robert Taft, Jr. et al.*

2  Orange County Superior Court Case No. 30-2019-01087702-CU-FR-CJC (the HBC Lawsuit).

3     60. Plaintiffs are informed and believe that Clay Tanner drafted the original version of that

4  complaint in order to obtain an advantage over his former clients.

5     61. That complaint was quickly amended to add Plaintiffs (with the exception of The Four, LLC)

6  as derivative defendants. Plaintiff, The Four, LLC, is a direct defendant in the HBC Lawsuit.

7     62. The complaint in the HBC Lawsuit has been amended two more times to include a third

8  amended complaint and now includes more than twenty causes of action.

9     63. Plaintiffs are informed and believe that Clay Tanner drafted the complaint in the HBC Lawsuit

10 that now names several of his former clients as derivative defendants, and one former client (The

11 Four LLC) as a direct defendant.

12    64. As a result of Clay Tanner's unauthorized and negligent practice of law in California,

13 Plaintiffs now are embroiled in a lawsuit brought by two investors who are either owned or controlled

14 directly to indirectly by Clay Tanner. This lawsuit is costing Plaintiffs substantial attorneys' fees and

15 costs and is preventing the progress and growth of Plaintiffs.

16                                   **STATUTE OF LIMITATIONS**

17    65. Plaintiffs have discovered within the last twelve months that their former General Counsel

18 formed an entity in direct competition with their business and usurped at least one corporate

19 opportunity in order to form and conduct that business.

20    66. On July 6, 2021, Clay Tanner produced for the first time, in the HBC Lawsuit, documents

21 relating to the Firm's IOLTA Trust account evidencing his sole control over investment money

22 intended for CPPG, PMH, and CMX, documents summarizing the payments made to the Firm, and

23 emails, and other documents suggesting the nature and extent of the legal work her performed on

24 behalf Plaintiffs that was in violations of his duty of care, his fiduciary duties, and in violation of

25 California Law and ethical standards.

26    67. On April 29, 2021, Clay Tanner was deposed in an action related to this case entitled *Hillsboro*

27 *Brown Capital, LLC et al v. Robert Taft, Jr. et al.* Orange County Superior Court Case No. 30-2019-

28 01087702-CU-FR-CJC. During his deposition testimony, Clay Tanner disclosed for the first time the

1  nature and extent of his breach of duties to Plaintiffs, the formation of a competing cannabis business,

2  and usurpation of Plaintiffs corporate opportunity with The Habit. Therefore, the causes of action

3  alleged in this complaint are timely brought against Clay Tanner and the Firm.

**FIRST CAUSE OF ACTION**
**Professional Negligence**
**(All Defendants)**

6  68. Plaintiffs reallege and incorporate by reference as though fully set forth herein, each and every

7  allegation contained in paragraphs 1 through 67 above.

8  69. Defendants owed Plaintiffs a duty to have a degree of learning and skill ordinarily possessed

9  by an attorney who practices and provides legal services in the same or similar locality and under the

10  same or similar circumstances.

11  70. Defendants owed Plaintiffs a duty to use the care and skill ordinarily exercised in like

12  circumstances by reputable members of the legal profession practicing in the same or similar locality

13  under the same or similar circumstances.

14  71. Given that all Defendants legal services were provides to Plaintiffs in California and based

15  upon California law, Defendants owed Plaintiffs a duty to conduct themselves during the course of

16  Defendants' representation of Plaintiffs' interests in accordance with the California Rules of

17  Professional Conduct, as codified in the California Business ad Professions Code, and to adhere to

18  the principals of ethics, honesty, and integrity in the performance of legal services on Plaintiffs'

19  behalf.

20  72. In doing the things herein alleges, Defendants failed to fulfill their respective duties to conduct

21  themselves during the course of Defendants' representation of Plaintiffs' interests in accordance with

22  their professional, ethical, of fiduciary duties and adhere to the principals of ethics, honesty, and

23  integrity in the performance of legal services on Plaintiffs' behalf.

24  73. Specifically, Defendants' failure to disclose their lack of license or authorization to practice

25  law in California, as alleged, fell below the standard of care required of an attorney and a law firm

26  required by law.

27  74. Also, Defendants' failure to comply with the California Rules of Professional Conduct,

28  including but not limited to Rule 1.7 (formerly Rule 3-310), and disclose the full nature and extent of

- 13 -
COMPLAINT

1    their potential and actual conflicts of interest when providing legal advice and performing legal work

2    in California fell below the required standard care that must be exercised by an attorney performing

3    those legal services.

4        75. Also, Defendants' failure to communicate the nature and extent of the legal work they

5    performed before abandoning their clients fell below the required standard care that must be exercised

6    by an attorney performing those legal services.

7        76. As a direct and proximate result of Defendants' reckless and/or negligent acts of misconduct

8    and Plaintiffs' justifiable reliance in the perceived integrity and ability of Defendants, and each of

9    their conduct, Plaintiffs continued their attorney-client relationship with Defendants, and each of

10    them, unwittingly putting their business and financial interests in the hands of counsel with

11    undisclosed conflicts and divided loyalties during the course of that relationship.

12        77. As a further direct and proximate result of Defendants' conduct and Plaintiffs' justifiable

13    reliance on the perceived integrity of Defendants, and each of their conduct, Plaintiffs have suffered

14    considerable economic damage including, but not limited to, debt for undisclosed loans and

15    transactions, substantial attorneys' fees and costs incurred to Plaintiffs' successor counsel in order to

16    mitigate damages caused by Defendants' misconduct, such additional economic and consequential

17    damages arising out of Defendants' misconduct according to proof, and collectible interest from the

18    first day allowed by law and as prayed for herein.

19        78. As a further direct and proximate result of Defendants', and each of their misconduct, as

20    alleged herein, Plaintiffs have engaged and retained separate legal counsel to investigate, prepare and

21    prosecute the claims herein and have incurred and will continue to incur attorneys' fees and related

22    litigation costs until this matter is resolved.

23                                **SECOND CAUSE OF ACTION**
                                  **Breach of Fiduciary Duty**
24                                     **(All Defendants)**

25        79. Plaintiffs reallege and incorporate by reference as though fully set forth herein, each and every

26    allegation contained in paragraphs 1 through 78 above.

27        80. As a result of the trust, faith, and confidence Plaintiffs placed in Defendants, and each of them,

28    as a result of Defendants', and each of their service to Plaintiffs as trusted legal counsel, a fiduciary

1    duty was created and did arise whereupon Defendants owed Plaintiffs a duty to act with the highest
2    degree of trust and good faith and with the utmost care in the handling of Plaintiffs' affairs and not
3    obtain or seek to obtain any advantage over Plaintiffs by the slightest misrepresentations,
4    concealment, or misdeed.

5    81. Prior to and throughout Defendants' representation of Plaintiffs in relation to the various
6    aspects of their cannabis businesses, Defendants, and each of them, intentionally and/or recklessly
7    concealed, and intentionally and/or recklessly failed to disclose, within the meaning of California
8    Rules of Professional Conduct 1.7 (former Rule 3-310), the material facts and relevant circumstances
9    relating to Defendants' unauthorized practice of law in California, their actual and potential conflicts
10    of interest in their representation of the various Plaintiff entities, their investors, their competitors,
11    and their intent to use the knowledge gained from confidential information they received in the
12    representation of Plaintiffs to their own advantage at the first available opportunity, including but not
13    limited to the usurpation of corporate/business opportunities.

14    82. Defendants had a professional and legal duty to obtain all clients informed written consent in
15    light of the potentially adversarial interests between Plaintiffs, and its investors, and Plaintiffs and its
16    potential competitors.

17    83. Defendants also breached their duty of undivided loyalty and duty of diligence owned to
18    Plaintiffs by repeatedly, recklessly, and/or with gross negligence failing to act with the commitment
19    and dedication to Plaintiffs; best interest in connection with Defendants' involvement with (1) the
20    preparation and handling of the Fund's First and Second Offering Memos, and the money raised from
21    the Fund; (2) the failure to obtain any contract with PMH/THP's construction contractor, (3) failure
22    to properly handle the Fund investments escrowed through Defendants' IOLTA Trust account, (4)
23    Defendants' failure to properly document and manage the PMH/THP construction build out in order
24    to usurp corporate/business opportunities, and (5) using confidential information obtained through
25    their representation of Plaintiffs to form and operate businesses in direct competition to Plaintiffs
26    (their former clients), including the usurpation of corporate/business opportunities.

27    ///

28    ///

84. Defendants also intentionally breached their fiduciary duty of loyalty when they repudiated and abandoned their attorney-client relationship with Plaintiffs in or about March 2019, in favor of their conflicting relationship with Plaintiffs' investors and competitors.

85. In doing the things herein alleged, Defendants failed to fulfill their duties and, instead, breached such duties as set forth herein.

86. Plaintiffs allege that Defendants, and each of their breaches of duty as set forth and specifically incorporated here were either intentional and/or reckless and were carried out with a complete and utter disregard for Plaintiffs interests or well-being.

87. As a direct and proximate result of Defendants deliberate and/or negligent acts of misconduct and Plaintiffs justifiable reliance in the perceived integrity of Defendants' and each of their conduct, Plaintiffs continued their attorney-client relationship with Defendants, and each of them, paying substantial legal fees and costs to Defendants during the course of that relationship.

88. As a direct and proximate result of Defendants' deliberate and/or negligent acts of concealment of material facts, Defendants' false promises and Plaintiffs' justifiable reliance on the perceived integrity of Defendants', and each of their conduct, Plaintiffs have suffered considerable economic damage including, but not limited to, debt for undisclosed loans and transactions, substantial attorneys' fees and costs incurred to Plaintiffs' successor counsel in order to mitigate damages caused by Defendants' misconduct; such additional economic and consequential damages arising out of Defendants' misconduct according to proof; and collectible interest from the first day allowed by law and as prayed for herein.

89. As a further direct and proximate result of Defendants', and each of their misconduct, as alleged herein, Plaintiffs have engaged and retained separate legal counsel to investigate, prepare and prosecute the claims herein and have incurred and will continue to incur attorneys' fees and related litigation costs until this matter is resolved.

### Third CAUSE OF ACTION
**Violation of Business & Professions Code § 6125 – Disgorgement of Fees Paid**
**(All Defendants)**

90. Plaintiffs reallege and incorporate by reference as though fully set forth herein, each and every allegation contained in paragraphs 1 through 89 above.

1       91. Defendants, and each of them, held themselves out as General Counsel for Plaintiffs, prepared

2 documents and conducted negotiations on behalf of Plaintiffs and collected substantial attorneys' fees

3 and costs from Plaintiffs despite their not being licensed or authorized to practice law in California.

4       92. These acts and the corresponding breaches of Defendants' duties to Plaintiffs were all in

5 violation of California Business & Professions Code § 6125 prohibiting the practice of law in

6 California without a license.

7       93. California law does not allow compensation for the unauthorized practice of law within this

8 State. (See, *Birbrower, Montalbano, Condon & Frank v. Superior Court*, 17 Cal. 4th 119, 127 (1998).

9 at 127 (*quoting Hardy v. San Fernando Valley Cham. of Comm.*, 99 Cal. App. 2d 572, 576, (1950)),

10 and *Golba v. Dick's Sporting Goods, Inc.*, 238 Cal. App. 4th 1251, 1264-5 (2015) (*quoting*

11 *Birbrower*).) Thus, Plaintiffs are entitled to recovery of all fees and costs paid by Plaintiffs to

12 Defendants totaling more than $171,694.50.

13   **WHEREFORE,** Plaintiffs pray for judgment against Defendants as Follows:

14       1. For general damages in an amount in excess of the minimum jurisdictional limits of this

15          Court;

16       2. For compensatory damages, according to proof;

17       3. For compensatory damages, including attorneys' fees and costs paid to successor counsel

18          to mitigate the harm caused by Defendants misconduct;

19       4. For disgorgement of all amounts paid to Defendants' as a result of their unauthorized

20          practice of law in California and in violation of California ethical standards;

21       5. For interest on the damages awarded, including prejudgment interest, at the legal rate,

22          from and after the first day allowed by law;

23       6. For reasonable attorneys' fees incurred in the defense of the HBC Lawsuit;

24 /// 

25 /// 

26 /// 

27 /// 

28 ///

1    7.  For costs of suit incurred herein; and

2    8.  For other and further relief as the Court deems just and proper.

3

4    DATED: June 25, 2021                    VANST LAW, LLP

5

6                                                      *[signature]*

7

8                                            By: _____
                                                  JACQUELINE S. VINACCIA
9                                                 Attorneys for Plaintiffs
                                                  PURPLE MOUNTAIN HOLDINGS, INC.;
10                                                CENTRAL PARTNERS PARENT GROUP, INC.;
                                                  CMX DISTRIBUTION, INC.; ECS
11                                                LABORATORIES, INC.; BRAND PACK, LLC.;
                                                  and THE FOUR, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 18 -
COMPLAINT

# EXHIBIT 1

SUMMARY OF TERMS
FOR CAPITAL INFUSION AND PARTNERSHIP
BETWEEN
BEN KNIGHT
AND
ROBERT TAFT JR.

October 19, 2017

This Summary of Terms ("Term Sheet") represents the current understanding of Robert Taft Jr. and Ben Knight with respect to the major issues relating to Knight's proposed investment of capital and contribution of future services to certain businesses affiliated with or related to Purple Mountain Holdings, Inc. (collectively, "PMH" and/or the "Company".)  While the terms and conditions agreed to herein may be subsequently addressed in a more formal agreement, this Term Sheet shall constitute a legally binding agreement between Knight and Taft, upon which Knight will fund the Initial Capital as outlined below.

## Strategic Goals

Realizing the unique opportunities created by the State of California's passage of Proposition 64, which goes into effect on January 1, 2018, it is our goal to partner our resources and efforts in order to aggressively grow the 420 Central business with the end goal of capturing a large share of the cannabis cultivation, manufacture, distribution/transportation and retail sale in Southern California. The Company's planned growth will be accomplished first through the expansion of retail operations (at the Company's current dispensary location) and simultaneous establishment of distribution and transportation channels of cannabis throughout Southern California (to be conducted out of the Company's distribution facility), and subsequently the manufacture and production of various cannabis and cannabis-related products, as well as other ancillary-related services (to be conducted at the Company's manufacturing facility), and finally into the cultivation of cannabis plants (in the warehouse located adjacent to the Company's retail dispensary.)

## Structure of Investment

In addition to the other contributions set forth herein, Knight is making an initial investment of Two Hundred Fifty Thousand ($250,000.00) Dollars (the "Initial Capital") in the Company, is contributing future services to the Company (as outlined below), and is committing to raise all money necessary for the build-out and start-up of the manufacturing facility for the manufacture and production of various cannabis and cannabis-related products under the Company umbrella (collectively, "Knight's Contributions").

In exchange for Knight's Contributions, at the Closing Knight is receiving a twenty-five percent (25%) interest in the distribution component of the Company (i.e. CMX Distribution, Inc., and all related entities)/ *Cadillax LLC.*

## Knight's Contributions

In addition to his Knight's Initial Capital, Knight will be providing certain future services to the Company. Knight's role will be similar to that of a chief operating officer, and will entitled to participate in all major operational and management decisions of the Company (along with Taft, and the other members in accordance with their membership interests and voting rights under applicable operating agreements.). Such services will include but not be limited to, raising all necessary capital for operations of the Company, overseeing all legal, tax and organizational structure, implementation of software assets to facilitate "seed to sale", and other services to be determined by Knight and Taft (collectively, the "Services".)

Knight will provide the foregoing services on a part-time basis until such time as the distribution facility is fully operational, at which time Knight will work towards a transition to a full-time role with the Company.

## Procurement of Future Financing

In addition to his Initial Capital and Services, Knight will also be responsible for procuring all necessary financing to meet the Company's growth goals outlined above, namely all financing necessary for the buildout of the Company's manufacturing facility. (Based upon current projections, the build-out costs for the manufacturing facility are expected to range from $1.0-1.2 M.) All such financing will be raised through the Company name and may be in the form of debt financing, equity financing, a combination thereof, or some other type of financing structure.

Upon procuring a commitment for the full funding of all money necessary for the start-up and operation of the manufacturing facility, Knight shall be assigned a 25% membership interest in the manufacturing component (i.e. Toronto Way Partners, Inc., and all related entities).

## Redemption and Assignment of Membership Interests in Central Partners

Upon the redemption of the 33.75% of membership interests in Central Partners Group, Inc., which interests are currently owned by Mike Donovan and Paul Cassidy, Knight shall be assigned 10% of such membership interests, and Robert Taft and Jeff Holcombe shall be assigned the remaining 23.75%. The resulting ownership of Central Partners Group, Inc. shall be that J.B. Burton will own 25%, Taft will own 28.75%, Jeff Holcombe will own 28.75%, Adam Agathakis will own 7.5% and Knight will own 10% of the membership interests in Central Partners Group, Inc. For the avoidance of doubt, each member shall be responsible for all profits and losses in accordance with their respective ownership percentages in Central Partners Group, Inc.

## Security for Initial Capital

As security for the Initial Capital, the Company's option rights to purchase the distribution facility, as set forth in the lease agreement for the distribution facility, shall be pledged as security to Knight, such that Knight shall have the right to exercise this option to purchase the property on behalf of both Knight and Taft in the event this agreement is breached, the Company is not profitable and/or Knight has not recouped his Initial Capital. All net proceeds received in connection with Knight's exercise of the option to purchase and subsequently sell the distribution facility shall be split equally between Taft and Knight.

## Estimated Closing Date

Knight's attorney will prepare the legal documents contemplated by this agreement, with the goal that all such documents will be executed and the required initial portion of the Initial Capital is funded no later than October 26, 2017.

## Assignment Rights

Knight shall have the right to transfer or assign his rights hereunder, in whole or in part, to an entity which is controlled by, or which is under common control by Knight, provided that Knight's entity agrees to be bound by the provisions under this term sheet and the applicable operating agreements.

## Salaries of Management

So long as Taft is not taking a salary from the manufacturing or distribution components of the Company, Knight will not be entitled to a salary for performance of his Services. However, should Taft or any other members take a salary from the manufacturing or distribution components of the Company, then Knight will also be entitled to a reasonable salary, in proportion to any other salaries being paid, the amount of which will be determined by the parties in good faith.

## Transfer Restrictions

Other than permitted transfers (i.e. for estate planning purposes), all future transfers of membership interests shall be made in accordance with the operating agreements for the respective companies.

## Preemption Rights

All members, including Knight, will have the right to invest in future financing rounds to avoid being diluted. This doesn't mean that members, including Knight, are required to put more money in

but if they want to and are able to, they have that right to maintain their ownership in any future funding round.

## Liquidation Preference

In the event of a change of control of the Company, liquidation, dissolution or winding-up of the Company or similar event, Knight will be entitled to receive, as a liquidation preference prior to payment of any other capital accounts, the amount of Knight's Initial Capital that has been funded but not repaid by the Company. After this liquidation preference has been paid, all remaining funds and assets of the Company legally available for distribution to the members in accordance with the distribution provisions set forth in the Company's operating agreements.

## Future Business Opportunities

If at any time either Knight or Taft become aware of, or develops, creates, or invests in any cannabis-related business opportunity or venture, the discovering party agrees to notify the non-discovering party of such opportunity or venture and use good-faith efforts to allow the non-discovering party to have an equal option to invest or participate in the business opportunity or venture.

Executed by Robert Taft Jr and Ben Knight this 22 day of October, 2017.


_____

Robert Taft Jr.


_____

Ben Knight

# EXHIBIT 2

## JOINT VENTURE AGREEMENT

THIS JOINT VENTURE AGREEMENT ("Agreement") is entered into and made effective this ___ day of November, 2017, by and among Robert A. Taft, Jr. ("Taft"), Jeff Holcombe ("Holcombe"), Jorge Burtin, in his personal capacity and as trustee for The Jorge Burtin Family Trust and The Rosalba Burtin Family Trust (collectively, "Burtin"), and Hillsboro Brown Capital, LLC ("HBC"), each referred to individually herein as a "JV Partner" and collectively as the "JV Partners."

WHEREAS, the JV Partners have entered into a Joint Venture (the "Joint Venture") to form, license, launch, operate and manage various cannabis-related business ventures, including for the testing, manufacturing, distribution and retail sale of cannabis products (each a "Project" and collectively as, the "Projects").

WHEREAS, the JV Partners have formed several entities (each a "JV Entity" and collectively as, the "JV Entities") in which to hold and operate the Projects. It is the intent of the Joint Venture that each Project be held in separate JV Entities so as to segregate the assets and liabilities of each Project. The current list of JV Entities owned by the Joint Venture is included hereto as Exhibit A, which Exhibit will be updated from time to time to reflect new JV Entities acquired by or disposed of by the Joint Venture.

WHEREAS, it is the intent of the JV Partners that each JV Partner own the percentage interests and rights in each Project reflected in this Agreement, despite how ownership or management of any Project is reflected in filings with the state or the JV Entity's governing documents.

WHEREAS, the JV Partners wish to hereby set forth the rights and ownership relating to each Project and the JV Entities.

NOW, THEREFORE, in consideration of the promises contained in this Agreement, the JV Partners hereby agree as follows:

1. **Capitalization and Financial Matters.**

(a) It is acknowledged and agreed that Taft and Holcombe have made their capital contributions in full as of the date of this Agreement, including through campaigning and lobbying services and by increasing the value of the assets owned by the JV Entities, and that no further capital contributions shall be required from Taft or Holcombe.

(b) It is further acknowledged and agreed that Burtin has made its capital contribution in full through the contribution of 1685 Toronto leased to the Joint Venture and the grant of the purchase options herein granted.

1

(c)    HBC shall make its capital contribution in the amount of $250,000.00 ("Capital Contribution") promptly following full execution and/or filing with the State of all corporate and governing documents for all JV Entities listed on Appendix A, amended to reflect HBC as a shareholder or member in accordance with this Agreement. All funds received from HBC will be placed in the operating bank account for Purple Mountain Holdings, Inc. ("PMH") and, promptly following the date of this Agreement, Ben Knight, as the Authorized Agent of HBC, shall be added as a signatory on such bank accounts or any other deposit accounts in which any portion of HBC's capital contribution is or will be transferred. (The parties acknowledge that $60,000.00 of HBC's Capital Contribution has already been funded via wire transfer to PMH.)

(d)    All contributions to be made in kind or services, including the value of such, shall be approved by all JV Partners in writing, which writing may include electronic communications.

(e)    The JV Partners acknowledge and agree that any money due from Chris Kanik following CUP approval is due and payable to Taft and not the Joint Venture or any other JV Partner.

(f)    All profits and losses from the Projects will be divided pro rata in proportion to the ownership in each Project. Profits will be distributed no less than monthly; *provided, however, (i) no profits from any JV Entity holding a conditional use permit ("CUP") or other license to manufacture, test distribute or sell cannabis may distribute any profits to any JV Partner until at least January, 2018 or such later date as mandated by State law*, and (ii) all profits distributable to Holcombe and Burtin will be paid to Taft until he is reimbursed for all monies paid by him for all rents and other costs relating to the real property for the Projects, which are documented in writing by Taft prior to full reimbursement. Notwithstanding the foregoing, the JV Entities shall keep sufficient capital reserves to operate their respective Projects.

2.    **Redemption and Assignment of Membership Interests in Central Partners Group, Inc.**

(a)    Upon the redemption of the outstanding shares owned by Mike Donovan and Paul Cassidy in Central Partners Group, Inc. ("CPG") (which interest is equal to 33.75% of the outstanding shares in CPG), HBC shall be assigned shares equal to 10% of the outstanding shares in CPG, and Taft and Holcombe shall each be assigned additional shares equal to 16.875% of the outstanding shares in CPG. These shares shall be issued to HBC, Taft and Holcombe with no further consideration owed by these JV Partners. Regardless of the foregoing, however, there shall be no assignment of shares unless and until such time as CPG reaches an agreement with Mike Donovan and Paul Cassidy to redeem such shares. For the avoidance of doubt, upon CPG's redemption and subsequent assignment of shares to HBC, Taft and Holcombe, the resulting ownership of CPG will be that Burtin owns 25%, Taft owns 28.75%, Holcombe owns 28.75%, Adam Agathakis owns 7.5%, and HBC owns 10%. (It is expressly acknowledged and agreed to by the JV Partners that Taft and Holcombe may assign up to 7.5% of its ownership interest in CPG to a third party as collateral for raising money necessary for the build-out and start-up of the manufacturing project, and the other JV Partners will not be required to give up any

2

additional equity in CPG for such.) Further for the avoidance of doubt, each shareholder shall be responsible for all profits and losses in accordance with their respective ownership percentages in CPG.

3.    **Security for HBC's Capital Contribution.**    As security for HBC's Capital Contribution, CadillaX Partners, LLC (and/or PMH) shall assign its option to purchase ("Distribution Purchase Option") the property located at 3505 Cadillac Avenue, Unit N-3, Costa Mesa, CA, which Option Right is set forth in that certain Standard Industrial/Commercial Single-Tenant Lease dated February 12, 2017, by and between the Russ Family Trust, as landlord, and CadillaX Partners, LLC, as tenant (the "Distribution Lease"). HBC may exercise the Distribution Purchase Option at any time in the event this Agreement is breached and/or HBC has not recouped its Capital Contribution and any other obligations for which it may become liable for in the future as a result of the Joint Venture. In the event HBC exercises the Distribution Purchase Option, upon the sale of the distribution facility to a third party, HBC shall be entitled to receive the full amount of its outstanding Capital Contribution that remains unpaid, and after the Capital Contribution has been paid back to HBC in full, any remaining net proceeds received in connection with a sale of the property shall be split equally between PMH and HBC. The parties acknowledge and agree that a memorandum evidencing the Distribution Purchase Option in favor of HBC may be recorded in the public records for Orange County, California.

4.    **Project Ownership.**

(a)    The Joint Venture currently owns or leases the following Projects:

- 1685 Toronto Way, Costa Mesa, CA 92626 ("1685 Toronto");
- 3505 Cadillac Ave., Unit N-3, Costa Mesa, CA 92626 ("Cadillac N-3");
- 3505 Cadillac Ave., Unit F-7, Costa Mesa, CA 92626 ("Cadillac F-7"); and
- 420 W. Central Avenue, Santa Ana, CA 92727 ("Retail Store").

All Projects acquired by the Joint Venture in the future will be subject to the terms of this Agreement.

(b)    Except as otherwise set forth in Section 2 above, the JV Partners shall have the following beneficial ownership in every Project currently owned or later acquired, and operated by the Joint Venture: Taft: 25%; Holcombe: 25%; Burtin: 25%; HBC: 25%.

(c)    HBC will use its best efforts to procure, on behalf of the JV Entities, all necessary financing for the buildout and startup of the manufacturing project at 1685 Toronto. Such financing for 1685 Toronto may be raised by HBC through debt financing, equity financing, a hybrid of debt and equity, or some other type of financing. (Based upon current projections, the build-out and start-up costs for 1685 Toronto is expected to be approximately $1.0-1.2M.) Upon closing on the funding for the build-out and start-up of 1685 Toronto, HBC shall be assigned shares equal to a 25% ownership interest in the manufacturing operating entity (Toronto Way Partners, Inc.) and any affiliated entities, at no further cost to HBC.

3

(d)    Except as set forth in Section 2 above, all JV Entities shall be beneficially owned by
the JV Partners in the percentages listed in subsection (b) above. The JV Partners acknowledge that
some entities may have record shareholders that result in different ownership percentages than
reflected in subsection (b), but that beneficial ownership shall be as indicated in subsection (b) in any
case. As of the date hereof, the JV Partners, not including HBC, represent and warrant that all of the
shares authorized for each JV Entity have been issued and are outstanding.

(e)    The JV Partners, not including HBC, further represent and warrant that (a) there are no
outstanding options, warrants, rights (including conversion or preemptive rights and rights of first
refusal or similar rights) or agreements, orally or in writing, to purchase or acquire from any of the JV
Entities any shares of stock (common or preferred), or any securities convertible into or exchangeable
for shares of stock; and (b) all outstanding shares of the JV Entities' stock are subject to a right of first
refusal in favor of the applicable JV Entity upon any proposed transfer (other than transfers for estate
planning purposes).

(f)    No other parties may be added to any JV Entity or Project without the unanimous vote
of all of the JV Partners listed herein.

(g)    It is the intent of the JV Partners that all JV Entities ultimately be held by PMH as the
record shareholder unless state licensing would prevent such ownership, at which time the JV Partners
shall mutually agree to the record ownership for those JV Entities not held in PMH.

(h)    Except as otherwise set forth herein, all material decisions for any Project must be
approved by JV Partners holding at least 75% of the outstanding shares for such JV Entity.

5.    **Real Property Matters.**

(a)    It is acknowledged and agreed that 1685 Toronto is owned by The Jorge Burtin Family
Trust and The Rosalba Burtin Family Trust. Burtin hereby grants an option to purchase 25% of the
Toronto Property to Taft for a purchase price equal to 25% of the amount paid by Burtin to acquire the
Toronto Property ("Option Percentage Price"), plus interest equal to 6% compounded per annum of
Option Percentage Price beginning to accrue from the date of purchase by Burtin. Burtin hereby grants
an option to purchase 25% of the Toronto Property to Holcombe for a purchase price equal to 25% of
the amount paid by Burtin to acquire the Toronto Property, plus interest equal to 6% compounded per
annum of Option Percentage Price beginning to accrue from the date of purchase by Burtin. Burtin
hereby grants an option to purchase 25% of the Toronto Property to HBC for a purchase price equal to
25% of the amount paid by Burtin to acquire the Toronto Property, plus interest equal to 6%
compounded per annum of Option Percentage Price beginning to accrue from the date of purchase by
Burtin. The above purchase options shall terminate upon termination of this Agreement or 25 years,
whichever is earlier, and are granted in consideration for each JV Partner's execution of this Agreement
and additional services to the Joint-Venture not included as capital contributions. In addition to the

4

foregoing options to purchase in favor of each JV Partner in accordance with his percentage set forth above, if at any time Burtin wishes to sell the Toronto Property to a third party, Burtin shall first offer to the other JV Partners the opportunity to purchase his percentage of the Toronto Property set forth above, at each applicable JV Partner's Option Percentage Price. Each JV Partner shall have thirty (30) days during which to accept said offer. If any JV Partner does not accept said offer within such 30-day period, Burtin shall be free to sell the non-accepting JV Partner's percentage interest to the third-party offer. In the event any JV Partner does not exercise its right of first refusal in accordance with the foregoing, if Burtin does not enter into an agreement with a third party and close on the transaction within ninety (90) days thereafter, each JV Partner's option to purchase set forth above shall survive and again be applicable.

(b)    Should any other JV Partner acquire any other real property to be used by the Joint Venture in the future, he/it shall grant the Joint Venture an option to acquire such property on par with the above conditions (i.e. pro rata in proportion to the JV Partners' ownership percentages in the Joint Venture at a purchase price equal to the amount paid for the property, plus 6% per year interest).

6.    <u>Right of First Refusal</u>. No JV Partner shall effect a transfer or disposition of its interests in the Joint Venture or any JV Entity or Project to a third party (a "<u>Restricted Transaction</u>") without first complying with the first-refusal provisions of this Section 6.

(a)    <u>Notice</u>. Prior to a JV Partner effecting a transfer that is a Restricted Transaction, the JV Partner first shall deliver to the other JV Partners a written notice (the "<u>Transfer Notice</u>") of such proposed transfer, setting forth the name of the proposed recipient or transferee of the shares, the portion of the Interests proposed to be transferred (the "<u>Offered Interests</u>"), and all terms and conditions of the proposed transfer. The JV Partner's delivery of such Transfer Notice shall be deemed to be an offer to sell such shares to the other JV Partners on the terms and conditions set forth in such Notice, pursuant to this Section 6.

(b)    <u>Purchase by JV Partners</u>. During the period of fifteen (15) days following delivery of Notice, each other JV Partner may elect to purchase all or any portion of such Offered Interests by delivering to the selling JV Partner a written instrument specifying the portion of such Offered Interests that the JV Partner elects to purchase. If the other JV Partners in the aggregate timely elect to purchase more than the Offered Interests, then the Offered Interests shall be apportioned among the subscribing JV Partners in proportion to their respective holdings in the Joint Venture.

(c)    <u>Closing</u>. If the entire Offered Interests proposed to be transferred is subscribed for as provided in Sections 6(b), above, then the closing of the purchase and sale of those Offered Interests shall be held on the date specified in the Transfer Notice, but in no event later than thirty (30) days after it is determined which parties are entitled to purchase such Offered Interests. At the closing, (I) the selling JV Partner shall execute and deliver an assignment or other transfer instrument in commercially reasonable form (including a warranty as to title) sufficient to vest in the purchasing JV Partner(s) title to the Offered Interests, free and clear of all liens and claims whatsoever, and (ii) the

purchasing JV Partner(s) shall deliver the purchase consideration in such amount and in such form as is specified in the Transfer Notice.

(d)    Failure to Purchase. If the other JV Partners fail to elect to purchase pursuant to the foregoing provisions of this Section 6 any Offered Interests, then the selling JV Partner thereafter may transfer or assign such remaining Offered Interests to the person named in the Transfer Notice at the price and on the terms and conditions set forth therein. However, if the selling JV Partner fails to close the transfer of the Offered Interests to the person named in the Transfer Notice within ninety (90) days after expiration of the election periods specified in Sections 6(c) above, then such right shall terminate and the selling JV Partner thereafter shall not sell or transfer such Offered Interests to any person without first again complying with the provisions of this Section 6.

(e)    The terms of this Section 6 shall apply to the ownership interests of all JV Entities whether or not such rights are enumerated in the JV Entities' governing documents.

7.    **Transfers at Death and Upon Divorce.** Notwithstanding any other provisions of this Agreement:

(a)    Divorce. If, in connection with the divorce or dissolution of the marriage of any JV Partner, any court issues a decree or order that transfers, confirms, or awards ownership interests in any of the JV Entities, Projects or this Joint Venture ("Ownership Interests"), or any portion thereof, to any Person other than the other JV Partner, then the other JV Partners shall have the right and obligation to purchase from such JV Partner his or its Ownership Interests that was so transferred, and such transferee shall have the obligation to sell the Ownership Interests to the other JV Partners, at the price and on the terms set forth in Section 7(f). The term "person" shall include entities and associations, as well as natural persons.

(b).    Death of JV Partner's Spouse. If, by reason of the death of a spouse of a JV Partner, any portion of shares is transferred to a person other than that JV Partner, then the JV Partner shall have the right and the obligation to purchase the Ownership Interests or portion thereof from the estate or other successor of his or her deceased spouse or transferee of such deceased spouse. The estate, successor, or transferee shall have the obligation to sell the Ownership Interests or portion thereof at the price and on the terms set forth in Section 7(f). If the JV Partner has failed for any reason to purchase the Ownership Interests within sixty (60) days after the date of death, the JV Partner immediately shall give notice to the other JV Partners, who shall have the right to purchase the Ownership Interests from the estate or other successor of the deceased spouse, and the estate or other successor of the deceased spouse shall have the obligation to sell the Ownership Interests to the other JV Partners, respectively, at the price and on the terms set forth in Section 7(e) and (f).

(c)    Death of JV Partner. Upon the death of any JV Partner, the personal representative of the estate of the deceased JV Partner or trustee of any trust holding shares established by any deceased JV Partner shall have the authority to act on behalf of such estate or trust of the deceased JV Partner

6

with respect to exercising the deceased JV Partner's rights for the purpose of settling the deceased JV Partner's estate or administering the deceased JV Partner's property, including any power the deceased JV Partner's has under this Agreement. If, by reason of the death of the JV Partner, any portion of an Ownership Interest is transferred to, or would otherwise be distributed to a person that is not an existing JV Partner, then the estate or other successor or transferee immediately shall give notice to the other JV Partners who shall have the right to purchase from the estate or other successor or transferee of the deceased JV Partner, and the estate or other successor or transferee of the deceased JV Partner shall have the obligation to sell the Ownership Interests to the other JV Partners, respectively, at the price and on the terms set forth in Sections 7(e) and 6(f).

(d)    Failure to Purchase. If the other JV Partners fail to elect and purchase the entirety of the Ownership Interests pursuant to the foregoing provisions of this Section 7, then the Ownership Interests shall be transferred to the non-permitted transferee. Any person who obtains shares pursuant to this Section 7 shall hold such Ownership Interests subject to all of the provisions of this Agreement and shall make no further transfers except in accordance with this Agreement.

(e)    Purchase Price. The purchase price of the Ownership Interests that are the subject of an option to purchase under this Section 7 shall be the fair market value of such shares as determined under this Section 7(e). Each of the selling and purchasing parties shall use his or her best efforts to mutually agree on the fair market value within thirty (30) days following the applicable triggering event (the court decree or order in a divorce (7(a)), the date of death of an JV Partner's spouse (7(b)), the date of notice under 7(c), or, if the purchase price has not previously been determined, the expiration of the 60-day period referenced in Sections 7(a) and (b)). If the parties are unable to agree upon the fair market value within the foregoing thirty (30) day period, the selling and purchasing JV Partners shall engage a professional business appraiser. The appraiser shall, within sixty (60) days after its appointment, determine the fair market value of the Ownership Interests in writing and submit its report to the parties. The parties shall each pay for an equal share of the fee charged by the appraiser.

(f)    The terms of this Section 7 shall apply to the ownership interests of all JV Entities, regardless of whether such rights are enumerated in any of the JV Entity's governing documents.

8.    Salaries of Management. Should any of the JV Partners take a salary from the manufacturing or distribution JV Entities, then Ben Knight will also be entitled to a reasonable salary, in proportion to any other salaries being paid, the amount of which will be determined by JV Partners in good faith.

9.    Term and Termination. This Agreement shall remain in effect so long as any Project is operating or expected to operate. This Agreement may be terminated by the mutual written agreement of all JV Partners.

7

10.    **Final Agreement.** This Agreement terminates and supersedes all prior understandings or agreements on the subject matter hereof. Should this Agreement and the governing documents for any JV Entity conflict, the terms of this Agreement shall control.

11.    **Severability.** If any provision hereof is invalid or unenforceable, then, to the fullest extent permitted by law, the other provisions hereof shall remain in full force and effect and there shall be deemed substituted for the provision at issue a valid, legal, and enforceable provision as similar as possible to the provision at issue in order to carry out the intentions of the JV Partners as nearly as may be possible.

12.    **Notices.** Any notice required by this Agreement or given in connection with it, shall be in writing and shall be given to the appropriate party by personal delivery or by certified mail, postage prepaid, or recognized overnight delivery service to the addresses for the JV Partners listed on the signature page or such other address as provided by a JV Partner to the other JV Partners in writing.

13.    **Governing Law.** This Agreement shall be construed and enforced in accordance with the laws of the State of California without resort to conflict of law principals. The parties agree that they will use their best efforts to amicably resolve any dispute arising out of or relating to this Agreement prior to litigation.

14.    **Assignment.** Any person or entity who acquires an interest in the Joint Venture shall agree to be bound by this Agreement, and any person or entity who acquires an interest in any Project or JV Entity must agree to be bound by the terms and conditions of this Agreement as they relate to such person's or entity's interests in the Project or JV Entity.

15.    **Jury Waiver.** Each party hereby irrevocably waives his/its rights to trial by jury in any action or proceeding arising out of this Agreement or the transactions relating to its subject matter.

16.    **Anti-Dilution Rights.** All of the JV Partners shall agree by unanimous vote, in writing, before any JV Partner's ownership interest in any of the JV Entities is diluted or otherwise reduced, unless otherwise done so voluntarily by the JV Partner whose ownership interest is being reduced. Failure to procure the unanimous vote of all of the JV Partners prior to the issuance of additional shares in a JV Entity will result in each JV Partner's shares being subject to a full ratchet adjustment. Such ratchet adjustment shall occur automatically and without further action on the part of the JV Partners, who shall be issued an additional number of shares such that each JV Partner's percentage interest in the JV Entity remains the same as set forth in Section 4(b) above. Each JV Partner's shares in the JV Entities will also be subject to proportional adjustment in accordance with the foregoing for splits, dividends, combinations, recapitalizations, reorganizations or otherwise.

17.    **Liquidation Preference.** In the event of a change of control of any JV Entity, or the liquidation, dissolution or winding-up or similar event for any JV Entity, HBC will be entitled to receive, as a liquidation preference prior to payment of any other capital accounts, the amount of HBC's Capital Contribution that remains outstanding. After this liquidation preference has been paid,

8

all remaining funds and assets of the entities legally available for distribution to the JV Partners in accordance with the distribution provisions set forth in such JV Entity's bylaws or under California law.

18.    **Future Business Opportunities.** If at any time any JV Partner becomes aware of, or develops, creates, or invests in any cannabis-related business opportunity or venture, the discovering JV Partner agrees to notify the non-discovering JV Partners of such opportunity or venture and use good-faith efforts to allow the non-discovering JV Partners to have an equal option to invest or participate in the business opportunity or venture.

19.    **Severability.** If at any time any provision of this Agreement or any part thereof is or becomes invalid or unenforceable, then neither the validity nor the enforceability of the remaining provisions or the remaining part of the provision shall in any way be affected or impaired thereby. The parties agree to replace the invalid or unenforceable provision or part thereof by a valid or enforceable provision which shall best reflect the parties' original intention and shall to the extent possible achieve the same economic result.

20.    **Amendments.** This Agreement may be amended only in writing by an instrument signed by all of the JV Partners.

21.    **Recitals.** The recitals to this Agreement are true and correct and made a part hereof.

*[Signature Page for JV Partners on Following Page]*

IN WITNESS WHEREOF, the JV Partners hereto have caused this Agreement to be entered into as of the date first above written.

**JV PARTNERS:**

_____
Robert Taft, Jr.

_____
Jeff Holcombe

_____
Jorge Burtin, individually, and as trustee of The Jorge Burtin Family Trust and The Rosalba Burtin Family Trust

_____
Ben Knight, as Manager of Hillsboro Brown Capital, LLC

10

## Appendix A
### (Joint Venture Entities)

- CadillaX Partners, LLC, a California limited liability company;
- CMX Distribution, Inc., a California corporation;
- ECS Laboratories, Inc., a California corporation;
- Purple Mountain Holdings, Inc., a California corporation;
- Toronto Way Partners, Inc., a California corporation; and,
- Central Partners Group, Inc., a California corporation.

Exhibit B

Electronically Filed by Superior Court of California, County of Orange, 06/28/2021 04:50:00 PM.
30-2021-01207562-CU-PN-CJC - ROA # 8 - DAVID H. YAMASAKI, Clerk of the Court By Arlene Gill, Deputy Clerk.

**SUM-100**

| | |
|---|---|
| **SUMMONS**<br>**(CITACION JUDICIAL)** | **FOR COURT USE ONLY**<br>*(SOLO PARA USO DE LA CORTE)* |

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

CLAIBORNE TANNER AND TANNER LAW
FIRM, LLC, and DOES 1 through 100

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

PURPLE MOUNTAIN HOLDINGS, INC.;CENTRAL PARTNERS
PARENT GROUP, INC.; CMX DISTRIBUTION, INC.(See attachment)

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: Judge Martha K. Gooding<br>*(El nombre y dirección de la corte es):* Orange County Superior Court | **CASE NUMBER:**<br>*(Número del Caso):* 30-2021-01207562-CU-PN-CJC |

700 Civic Center Drive West
Santa Ana, CA 92701

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Jacqueline S. Vinaccia, Vanst Law, LLP 3170 Fourth Ave, Ste. 250B, San Diego, CA 92103 858 243 4299

| DATE: ___ 06/28/2021<br>*(Fecha)* | DAVID H. YAMASAKI, Clerk of the Court | Clerk, by<br>*(Secretario)* | Arlene Gill | , Deputy<br>*(Adjunto)* |
|---|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)

          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

[SEAL]

Page 1 of 1

| | | |
|---|---|---|
| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |

MC-025

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Purple Mountain Holdings, Inv. et al. v, Claiborne Tanner et al. | 30-2021-01207562-CU-PN-CJC |

ATTACHMENT *(Number):* <u>Summons</u>

*(This Attachment may be used with any Judicial Council form.)*

ECS LABORATORIES, INC.; BRAND PACK, LLC.; THE FOUR, LLC.

*(If the item that this Attachment concerns is made under penalty of perjury, all statements in this Attachment are made under penalty of perjury.)*

Page <u>1</u> of <u>1</u>

*(Add pages as required)*

Form Approved for Optional Use
Judicial Council of California
MC-025 [Rev. July 1, 2009]

**ATTACHMENT
to Judicial Council Form**

www.courtinfo.ca.gov